1
2
3
4
5
6
7
8          **UNITED STATES DISTRICT COURT**

9          **CENTRAL DISTRICT OF CALIFORNIA**

10          **WESTERN DIVISION**

11

12   S. W., by and through his Guardian Ad          )    No. CV 19-4538-PLA
     Litem, WANDA W.,                               )
13                                                   )    **MEMORANDUM OPINION AND ORDER**
                          Plaintiff,                 )
14                                                   )
                  v.                                 )
15                                                   )
     ANDREW M. SAUL, COMMISSIONER                    )
16   OF SOCIAL SECURITY                              )
     ADMINISTRATION,                                 )
17                                                   )
                          Defendant.                 )
18   _____ )

19                                        **I.**

20                                  **PROCEEDINGS**

21          S. W.[1] ("plaintiff"), by and through his Guardian Ad Litem, Wanda W., filed this action on

22   May 24, 2019, seeking review of the Commissioner's[2] denial of his application for childhood

23   Supplemental Security Income ("SSI") payments.  The parties filed Consents to proceed before

24   _____

25          [1]     In the interest of protecting plaintiff's privacy, this Memorandum Opinion and Order uses (1)
     plaintiff's first and last initials, and his guardian ad litem's first name and last initial, and (2) plaintiff's
26   year of birth in lieu of a complete birth date.  See Fed. R. Civ. P. 5.2(c)(2)(B), Local Rule 5.2-1.

27          [2]     Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul, the
     newly-appointed Commissioner of the Social Security Administration, is hereby substituted as the
28   defendant herein.

a Magistrate Judge on June 14, 2019, and March 9, 2020.  Pursuant to the Court's Order, the parties filed a Joint Stipulation (alternatively "JS") on April 24, 2020, that addresses their positions concerning the disputed issues in the case.  The Court has taken the Joint Stipulation under submission without oral argument.

## II.

## BACKGROUND

Plaintiff was born in 2001.  [Administrative Record ("AR") at 94.]  On September 28, 2009, Wanda W. filed an application seeking SSI payments on behalf of plaintiff, alleging that he has been disabled since April 2, 2008, due to attention deficit hyperactivity disorder ("ADHD") and bipolar disorder.  [Id. at 19, 94-97, 98, 102.]  After plaintiff's application was denied initially and upon reconsideration, plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ").  [Id. at 19, 77.]  A hearing was held on May 24, 2011, at which time plaintiff appeared represented by an attorney, and testified on his own behalf.  [Id. at 35-63.]  Wanda W. also testified on plaintiff's behalf.  [Id. at 50-62.]  A medical expert ("ME"), pediatric neurologist David T. Huntley, M.D., also testified.  [Id. at 38-44.]  On August 22, 2011, the ALJ issued a decision concluding that plaintiff was not under a disability since September 28, 2009, the date the application was filed.  [Id. at 19-30.]  Plaintiff requested review of the ALJ's decision by the Appeals Council, which was denied on December 7, 2012.  [Id. at 6-10.]  Plaintiff filed an action with this Court in case number CV 13-2881-PLA, and on March 19, 2014, this Court remanded the matter.  [Id. at 529-44; see also id. at 547-49 (Appeals Council remand order).]  On December 3, 2014, a remand hearing was held, at which time plaintiff again appeared represented by an attorney and testified on his own behalf.  [Id. at 454-77.]  Wanda W. [id. at 468-76] and Dr. Huntley [id. at 457-67] again testified.  On February 26, 2015, the same ALJ issued a decision again concluding that plaintiff was not under a disability since September 28, 2009, the date the application was filed.  [Id. at 481-91.]  Plaintiff filed a second action in this Court in case number CV 15-3189-PLA, and on June 2, 2016, this Court again remanded the matter.  [Id. at 1182-99; see also id. at 1173-75 (Appeals Council remand order).]  On November 15, 2018, a remand

hearing was held before a different ALJ, at which time plaintiff again appeared represented by an attorney and testified on his own behalf.  [Id. at 1146-52.]  Wanda W. [id. at 1153-67] and a different ME, Perry Grossman, a board-certified pediatrician [id. at 1138-43] also testified.  On January 30, 2019, the ALJ issued a decision concluding that plaintiff was not under a disability since September 28, 2009, the date the application was filed.  [Id. at 1107-27.]  At that time, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 404.984.  This action followed.

### III.

### STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits.  The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards.  Berry v. Astrue, 622 F.3d 1228, 1231 (9th Cir. 2010) (citation omitted).

"Substantial evidence . . . is 'more than a mere scintilla[,]' . . . [which] means -- and means only -- 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Biestek v. Berryhill, 139 S. Ct. 1148, 1154, 203 L. Ed. 2d 504 (2019) (citations omitted); Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017).  "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld."  Revels, 874 F.3d at 654 (internal quotation marks and citation omitted).  However, the Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence."  Id. (quoting Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014) (internal quotation marks omitted)).  The Court will "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely."  Id. (internal quotation marks and citation omitted); see also SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S. Ct. 454, 87 L. Ed.  626 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

## IV.

## <u>THE EVALUATION OF DISABILITY IN A CHILD</u>

To qualify for disability benefits, a child under the age of eighteen must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).  No individual under the age of 18 who engages in substantial gainful activity may be considered to be disabled.  <u>Id.</u> § 1382c(a)(3)(C)(ii).

## A.    THE THREE-STEP EVALUATION PROCESS

The Commissioner (or ALJ) follows a three-step sequential evaluation process in assessing whether a child is disabled.  20 C.F.R. § 416.924.  In the first step, the Commissioner must determine whether the child is currently engaged in substantial gainful activity; if so, the child is not disabled and the claim is denied.  <u>Id.</u>  If the child is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the child has a "severe" impairment or combination of impairments causing more than minimal functional limitations; if not, a finding of nondisability is made and the claim is denied.  <u>Id.</u>  If the child has a "severe" impairment or combination of impairments, the third and final step requires the Commissioner to determine whether the impairment meets, medically equals, or functionally equals an impairment in the Listing of Impairments ("Listings") set forth at 20 C.F.R., part 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded; if not, a finding of nondisability is made and the claim is denied.  20 C.F.R. § 416.924.  In determining whether a child's impairment or combination of impairments functionally equals an impairment in the Listings, the Commissioner must assess the child's functioning in six domains:  (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being.  <u>Id.</u> § 416.926a(a)-(b).  To functionally equal an impairment in the Listings, the child's impairment or combination of impairments must result in a "marked" limitation in two

4

1  of the domains or an "extreme" limitation in one domain.  Id. § 416.926a(d).  A "marked"

2  limitation is one that "interferes seriously with [the child's] ability to independently initiate,

3  sustain, or complete activities."  Id. § 416.926a(e)(2).  By contrast, an "extreme" limitation is one

4  that "interferes very seriously with [the child's] ability to independently initiate, sustain, or

5  complete activities."  Id. § 416.926a(e)(3).

6

7  **B.    THE ALJ'S APPLICATION OF THE THREE-STEP PROCESS**

8          At step one, the ALJ found that plaintiff was a school-age child on September 28, 2009, the

9  date the application was filed, and at the time of the most recent hearing, an adolescent.  [AR at

10  1111.]  He also determined that plaintiff had not engaged in substantial gainful activity since the

11  application date.  [Id.]  At step two, the ALJ concluded that plaintiff has the severe impairments

12  of ADHD, impulse control disorder, and asthma.  [Id.]  He found that plaintiff's other impairments

13  of IgA nephropathy, "mood disorder (bipolar disorder/disruptive mood dysregulation disorder)," and

14  specific learning disorder, were nonsevere.  [Id. at 1111-12.]  At step three, the ALJ determined

15  that plaintiff does not have an impairment or a combination of impairments that meets or medically

16  equals any of the impairments in the Listing, or that functionally equals the severity of the Listings.

17  [Id. at 1113.]  Specifically, he found that plaintiff has "less than marked limitation" with respect to

18  his health and physical well-being, and in his abilities to acquire and use information, attend to and

19  complete tasks, interact with and relate to others, and care for himself.  [Id. at 1119-26.]  He

20  determined that plaintiff has no limitation in moving about and manipulating objects.  [Id. at 1124.]

21          Accordingly, the ALJ determined that plaintiff has not been disabled since September 28,

22  2009, the date the application was filed.  [Id. at 1127.]

23

24                                              **V.**

25                                    **THE ALJ'S DECISION**

26          Plaintiff contends that the ALJ erred when he:  (1) failed to adequately comply with the

27  Court's June 2, 2016, remand order in case number CV 15-3189-PLA; and (2) failed to properly

28  evaluate plaintiff's disability claim.  [JS at 3, 8.]  As set forth below, the Court agrees with plaintiff

1  and remands for payment of benefits.

2

3  **A.    THE COURT'S REMAND ORDER**

4        The Court ordered the ALJ on remand to credit as true the statements of plaintiff's guardian

5  ad litem, Wanda W., "concerning plaintiff's daily activities and his limitations resulting from his

6  alleged impairments"; and to "consider and discuss the statement attributed to plaintiff's tutor at

7  the YMCA. [See AR at 271.]." [AR at 1198.]  Plaintiff's counsel was also ordered to "augment the

8  record with a copy" of plaintiff's tutor's statement, if available.  [Id.]  The ALJ on remand was also

9  ordered to do the following:

10        (1) With the assistance of a qualified expert or experts,[FN] the newly assigned ALJ
          on remand shall specifically and clearly reevaluate the record evidence regarding
11        plaintiff's alleged impairments, including (a) ADHD, (b) mood disorder, and (c)
          specific learning disability, and, for any medically determinable impairment, provide
12        a legally sufficient explanation of his or her reasons for finding it to be severe or
          nonsevere;
13
          [FN]   Given the passage of time, the ALJ should consider whether additional
14               consultative examinations should be ordered.

15        (2) Evaluate at step three whether any medically determinable impairment found at
          step two meets, or medically or functionally equals in severity, an impairment in the
16        Listings;

17        (3) In conducting the step three analysis, the ALJ, shall also address plaintiff's
          standardized test results in the record and, if the ALJ chooses not to rely on any
18        such scores, shall explain his or her reasons for doing so; and

19        (4) If required to interpret plaintiff's standardized test scores in terms of standard
          deviations, the ALJ shall seek the assistance of a qualified expert to assist in
20        interpreting such scores, including relating such scores, along with plaintiff's
          academic records to the extent applicable, to fully develop the record so that the
21        ALJ can properly make his or her evaluation as to whether plaintiff's medically
          determinable impairments meet or functionally equal a Listing.
22

23  [Id. at 1198-99 (some footnotes omitted).]

24

25  **B.    THE PARTIES' CONTENTIONS**

26        **1.    Plaintiff's Contentions**

27        Plaintiff generally contends that the ALJ failed to "adequately follow" either the "form or the

28  intent" of the Court's June 2, 2016, remand order.  [JS at 3.]  He specifically contends that

6

"through the course of three hearings," the two assigned ALJs have failed to follow the criteria for evaluating a child's disability case; have relied on the hearing testimony of medical experts that "fail[s] to evidence a proper and satisfactory evaluation of the file or of the rules and regulations in evaluating a child's disability case"; failed to evaluate plaintiff's standardized test results in relation to the childhood disability criteria; failed to "credit as true the witness testimony" of plaintiff's guardian ad item and to "properly consider it in the evaluation of the child criteria"; and failed to consider the report of plaintiff's after-school tutor.  [Id. at 3-4.]  He contends that the evidence in the "voluminous record" supports a finding that plaintiff is "unable [to] independently initiate, sustain or complete activities as the average child," "has always been in special classes due to a specific learning disorder," and "suffers from ADHD as well as an impulse control disorder," as reflected in his Kaiser Permanente medical records.  [Id. at 4.]

Plaintiff further submits the ALJ erroneously determined that plaintiff did not have any marked functional impairments and that plaintiff's impairments did not meet or functionally equal any of the Listings [id. at 11-15] despite the following evidence:  (1) his school records reflecting continuing special education since 2009, continuing behavior problems with suspensions a couple of times in each school year, and testing results reflecting very low scores compared to others in his age range; (2) an initial mental health assessment from the Los Angeles County - Department of Mental Health on February 7, 2008 (reflecting irritability, distractibility, hyperactivity, and opposition behavior, with poor concentration and limited cooperation) [id. at 9 (citing AR at 232, 235)]; (3) medical records from Kaiser Permanente reflecting psychiatric and psychological treatment for ADHD and impulse control disorder, and frequent medication changes [id. at 9-10 (citing AR at 780-1103, 1474-1665)]; (4) a pediatric consultative examination on November 30, 2016, reflecting gross cognitive ability moderately to severely below that expected of a 14-year old [id. at 10 (citing AR at 1292-94)]; (5) a December 19, 2016, psychological consultative examination conducted by Robin Campbell, Ph.D., reflecting IQ scores in the 50s and 60s; and finding that intellectually plaintiff was in the extremely low range, and evidenced impulsive behavior, socially inappropriate behavior, impaired attention and concentration, a marked inability to engage in sustained activity for a period of time, and a marked inability to engage in school and

1   play activities in an age-appropriate manner [id. (citing AR at 1297-1304)]; and (6) witness

2   testimony and test results supporting marked impairments in acquiring and using information,

3   attending and completing tasks, and interacting and relating to others.

4

5          **2.     Defendant's Contentions**

6          Defendant generally responds that plaintiff's contentions are "vague, conclusory and

7   inaccurate" and therefore "may be considered waived." [Id. at 4-5.]  He specifically contends that

8   the ALJ properly relied on the expert testimony of Board-certified pediatrician Perry Grossman,

9   M.D., who testified at the hearing, and states that plaintiff's counsel only offered her own lay

10  opinion (at the hearing) that Dr. Grossman's testimony should be rejected and additional testing

11  ordered; the ALJ explicitly addressed plaintiff's standardized test results and relied on Dr.

12  Grossman's testimony that plaintiff's low IQ scores "did not properly reflect Plaintiff's functioning

13  as they were inconsistent with the overall record," which reflected that plaintiff "had significant

14  academic achievements (passing or advanced grades in English and math, being generally in [a]

15  regular classroom setting, paying [sic] baseball and football)"[3]; credited Wanda W.'s testimony as

16  true "and assessed Plaintiff with greater limitations on that basis"; and, with respect to the alleged

17  statement made by plaintiff's tutor, the only evidence in the record of that statement is plaintiff's

18  counsel's description of the statement in her pre-hearing brief, and the need for a tutor "does not

19  mean that Plaintiff would have per se marked limitations in any area in light, in particular, of

20  Plaintiff's achievements and Dr. Grossman's expert testimony."  [Id. at 5-8.]

21         Defendant also asserts that in determining plaintiff was not disabled, the ALJ properly found

22  the following:  plaintiff's specific learning disability was not a severe impairment "in light of the

23  absence of more than minimal functional limitations lasting at least 12 months" [id. at 16 (citing AR

24  at 1111, 1112)]; plaintiff's alleged noncompliance with medication leads to his disruptive behavior

25

26         [3]   There is minimal evidence that plaintiff played football (and possibly baseball) between
    September and November 2014 (while in 7th grade), as the records reflect that he received an
27  injury to his neck and an injury to his knee while playing football, and reported that he also played
    baseball.  [AR at 1058, 1073, 1088.]  There is no evidence that he played any sports after that
28  time.

[id. at 17 (citing AR at 1321)]; plaintiff was "generally able to attend regular classes for about a third to over half of the school day" and was "capable of good work and even able to earn above-average and excellent grades in math, science, and English at times" [id. (citing AR at 176-77, 252-53, 636, 659, 681, 694, 718, 746, 753, 1121-22, 1306, 1327, 1330, 1356, 1364, 1371, 1374, 1377, 1415, 1421)]; properly considered the testimony of Wanda W. and "assessed greater limitations on that basis including in interacting with others due to behavioral issues" [id. at 18 (citing AR at 1114, 1117, 1122-24)]; acknowledged that although standardized testing "is the preferred method of documenting the severity of functional limitations," it does not exclude consideration of other evidence, such as plaintiff's purportedly higher scores in areas such as brief reading, the fact that Dr. Campbell found that plaintiff's low IQ scores "did not support a diagnosis of mental retardation," and school records that reflected "some significant academic achievements with many passing or better grades" [id. at 18-19 (citing AR at 722, 744, 750, 1120-21, 1122, 1302, 1406, 1412, 1446, 1450)]; and Dr. Grossman's expert assessment of plaintiff's abilities.  [Id. at 19.]

**C.    DR. GROSSMAN'S TESTIMONY**

       As relevant herein, Dr. Grossman testified that plaintiff has the severe impairments of attention deficit hyperactivity disorder, and impulse control disorder.  [Id. at 1139.]  Dr. Grossman did not provide testimony specifically relating to the severity or non-severity of plaintiff's specific learning disability, as ordered by the Court in its remand Order.   [Id. at 1139-43.]  Neither did his testimony reflect that he *specifically* and *clearly* evaluated the record evidence as ordered by the Court on remand.

       With respect to plaintiff's functional limitations, Dr. Grossman testified to the following:

(1)    plaintiff has a "less than marked" limitation in the functional area of acquiring and using
       information, based on (a) his "variable performance, academically"; and  (b) his "STAR
       testing that children in California get," which shows that plaintiff received "an advanced
       grade in English and language art, and proficient in English and language art, basic in

math."[4]   [Id. at 1140.]  Based on these findings, Dr. Grossman concluded that "there isn't a serious academic issue, but he -- at his -- he's a bit behind academically" [id.];

(2)     plaintiff has a "less than marked" limitation in attending and completing, as plaintiff has been on medication for his ADHD "for some time" and "one would expect . . . that his attention deficit would improve . . . [a]nd it appears that it has improved" [id.];

(3)     plaintiff has "no limitation" in the area of interacting and relating, noting that plaintiff "is said to have a lot of friends, and gets along fairly well in school" [id.];

(4)     plaintiff has "some difficulty" with self care as he "manages to get himself into some trouble at school, and so, he has some self-control issues," and is in the "less-than marked category" with respect to that area of functioning [id. at 1141];

(5)     plaintiff has a "less than marked" limitation with respect to physical health and well-being based on the fact that he has asthma and is on medication for it, and because he is on medication for his ADHD and impulse control disorder [id.]; and

(6)     plaintiff has "no limitation" with respect to moving about and manipulating.  [Id. at 1140-41.]

The ALJ gave "great weight" to Dr. Grossman's testimony and it appears that he generally relied on Dr. Grossman's opinions and findings with respect to plaintiff's functional limitations, with the exception of finding a less than marked limitation in interacting and relating with others (instead of Dr. Grossman's "no limitation" in that area[5]) "given some medical and school records reflecting that he has been in fights or conflicts with others at times."  [Id. at 1117.]

On cross-examination, plaintiff's counsel asked Dr. Grossman to address plaintiff's December 19, 2016, psychological evaluation, in which the evaluator determined plaintiff had a full-scale IQ score of 52.  [Id. at 1141 (see also id. at 1297-1304).]  Dr. Grossman responded that plaintiff "doesn't have a full-scale I.Q. of 52."  Dr. Grossman -- who was appearing telephonically -- then asked plaintiff's counsel if plaintiff was in the room with her, and started to ask "[d]oes he look

---

[4]     Dr. Grossman did not specify the records to which he was referring.

[5]     It appears that Dr. Grossman included plaintiff's behavioral self-control issues in the self care category while the ALJ included them in the interacting and relating with others category.

like --," whereupon counsel interrupted him before he could complete that question, and asked Dr.

Grossman how he could say that plaintiff did not have a full scale score of 52 when the testing was

determined to be valid.[6] [Id. at 1141-42.] Dr. Grossman acknowledged that the test administered

both in 2016 and 2009 is a valid test, but pointed out that with "exactly the same test" administered

on November 12, 2009 (when plaintiff was 7 years old), his full-scale IQ at that time "was 83, not

52." [Id.] At that point, the following colloquy occurred:

> [ME]: In addition, as I mentioned, he has done some very admirable things,
> academically.  For example, scoring an advanced grade in . . . English Language
> Art -- a basic grade in math, which means that he does math okay.  He's in a regular
> classroom setting, in general.  He's able to play baseball --
>
> [Counsel]:  He's not in regular setting.
>
> [ME]: And football.  It would be difficult to play football with an I.Q. of 52. . . . So, I
> take all [INAUDIBLE] things, taking together, it seems to have some doubt on the
> validity of that evaluation.  The other thing is, I always look at the . . . [t]otality -- let
> me finish.  I look at the totality of the record.  This is a huge record, over 1,000
> pages, and there's nothing in the record to suggest that any of those scores are
> correct.
>
> [Counsel]:  Your honor, [plaintiff] has been in special education all his life.  He has
> never excelled [in] classes and he does not excel in sports.  He does not excel with
> people his own age, he only excels with people younger than himself, and he does

---

[6]   In full, the transcript reflects this colloquy as follows:

> [Counsel]  . . . Dr. Grossman, have you reviewed the December 19, 2016
> psychological evaluation?  . . .
>
> [ME] I've reviewed all 1,100 pages of the record, including that.  That should be
> discarded.
>
> [Counsel]  Why?
>
> [ME]  He doesn't have a full-scale I.Q. of 52.  Is he there now?
>
> [Counsel]  Yes, he is.
>
> [ME]  Does he look like --
>
> [Counsel]  But how can you say that when he's been tested and this is a valid
> testing?

[AR at 1141-42.]

1    not participate and cannot keep pace.  I don't understand where this testimony
     comes from.  It's not substantiated by anything [i]n the record.

2
     [ME]:  All right.  Let me -- okay.  First of all, regular classes -- he's --

3

4    [Id. at 1141-44.]  At that point the call dropped and it appears that the ALJ was not able to

5    reconnect the call.  [Id. at 1143 ("Let's try to reach the doctor [phone dialing].").]  The ALJ agreed

6    to let counsel "comment on" Dr. Grossman's testimony:

7        ATTY:  We finally have some good reports, after all these years, and there's nothing
         to contradict these reports.  It's consistent with all [plaintiff's] testing -- he's stayed
8        back in school, he's been held back -- how many times?  Twice?

9        CLMT:  Yeah.

10       ATTY:  Twice he's been held back in classes.  He's way below average in his testing
         scores, and he has disruptive behavior throughout.  . . . I mean this is listing level.
11       And on top of that, we have I.Q.s -- even if you only did the verbal comprehension
         of 65 -- and he's always had that problem.  He's always had memory problems and
12       they have that at 68.  But he also has marked impairments in a couple of the
         subsidiary criteria, and sustained activity for a period of time is markedly impaired;
13       this is on a one-shot consultative examination without any school records.  . . . Also
         markedly impaired in age appropriate activity.  I mean, we have the listing
14       impairments right in this one report alone.  Plus, we have everything backing him up
         with school records.

15

16   [Id. at 1145 (citing id. at 1297-1304).]

17       The ALJ, however, gave "great weight" to Dr. Grossman's opinion:

18       Dr. Grossman testified that he did not give consultative examiner Dr. Campbell's
         conclusions much weight, expressing the view that several aspects of Dr.
19       Campbell's report, such as the IQ scores on the WISC-IV, were not consistent with
         the medical evidence as a whole, such as WISC-IV scores from November 2009
20       that were significantly higher than those obtained during Dr. Campbell's evaluation.
         Generally, Dr. Grossman's opinion is afforded great weight, as it is based on and
21       generally consistent with a thorough review of the above-discussed medical
         evidence.

22

23   [Id. at 1117.]  The "above-discussed medical evidence" appears to primarily refer to evidence that

24   plaintiff had been on medication for his ADHD and impulse control disorder since age seven, and

25   that after starting those medications in 2009, it was reported by Wanda W. that he "calmed down

26

27

28

1  significantly."[7]  [Id. at 1115 (citations omitted).]  The ALJ stated that this suggested that plaintiff's

2  treatment was effective when he complied with treatment, which he found was also consistent with

3  records reflecting that plaintiff's focus "increased with treatment, and he was able to complete

4  homework on a daily basis and do better in school.  . . . Overall, the record reflects significant

5  improvement and stabilization with treatment," and mental status examinations reflecting, among

6  other things, alertness, awareness, appropriate eye contact, average activity with no behavioral

7  disturbances, intact gross and fine motor skills, coherent and relevant response to questions, clear

8  and intelligible verbalizations, cooperative behavior, satisfactory attention and concentration, and

9  intact judgment and insight.  [Id. at 1115-16 (citing to many of the same exhibits -- and sometimes

10  even the same page of the exhibits -- that he cited to as reflecting hyperactive or disruptive

11  behavior in clinical settings [see n.7], including AR at 319-21, 336-41, 386-87, 393, 398-99, 407,

12  412, 415, 442, and 1297-1304 (Dr. Campbell's 2016 evaluation)).]  The ALJ concluded that the

13  "generally normal findings on mental status evaluation are consistent with no greater limitations

14  in the six functional domains than discussed" in the decision.  [Id. at 1116.]

15  After reviewing the record and considering Dr. Grossman's testimony as detailed above,

16  the Court finds that Dr. Grossman's testimony was nowhere near the adequacy of testimony the

---

[7]  The "above-discussed medical evidence," however, also includes a discussion of plaintiff's records up through part of 2011 (when plaintiff was nine or ten years old), as well as the mental status evaluation conducted by Dr. Campbell as part of her 2016 consultative psychological evaluation [id. at 1297-1304], all of which the ALJ stated described plaintiff's "*ADHD* as 'mild to moderate' and occurring daily, with poor attention to details, difficulty in maintaining attention, not listening when spoken to, failing to complete school work, difficulty with organizing, avoiding tasks that require sustained concentration, and being easily distracted and forgetful." [AR at 1115 (citing id. at 384) (emphasis added).]  It also included the ALJ's discussion reflecting that in a clinical setting during that period, i.e., primarily through part of 2011, plaintiff at times presented as "animated, hyperactive, distracted, and verbal, with normal to restless motor activity, mildly impaired concentration, mildly impaired judgment, mildly to moderately impaired impulse control with impulsive behavior, poor judgment, and limited cooperation." [Id. (citing id. at 309, 314, 386, 407, 1297-1304 (Dr. Campbell's psychological evaluation)).]  The Court assumes that the ALJ's intent in referring to Dr. Grossman's opinion as being *consistent* with the "above-discussed medical evidence" was to refer only to its consistency with the improvement reported in plaintiff's focus when he started taking medication for ADHD and impulse control disorder in 2009, and not as consistent with the abundance of other evidence reflecting continued hyperactivity, distractibility, or moderately impaired impulse control with impulsive behavior, poor judgment, and limited cooperation.

Court expected would be obtained from the medical expert on remand.  Instead of specifically and clearly reevaluating the record evidence with respect to plaintiff's ADHD, impulse control disorder, and specific learning disability (which he never addressed) -- and as discussed in more detail below -- Dr. Grossman appears to have completely misinterpreted and/or misread plaintiff's medical records generally and his academic records specifically.  As such, his testimony did not comply with the Court's remand Order.

## D.   ANALYSIS

As will also be discussed in more detail below, the ALJ erred when he found that Dr. Grossman's testimony was "based on and generally consistent with a thorough review" of the medical evidence and gave it "great weight," and to the extent he relied on the same evidence relied on by Dr. Grossman for the same reasons stated by Dr. Grossman.

### 1.   Plaintiff's "Less Than Marked" Functional Limitations

#### a.   Plaintiff's Academic Performance and School Testing

With respect to the standardized tests taken by plaintiff, the ALJ stated the following:

> [W]hile some of these test results have been low, the undersigned does not find these scores to be inconsistent with a finding of less than marked limitations in the functional domains further discussed below, including in acquiring and using information and attending and completing tasks.
>
> . . . .
>
> Notably, however, [plaintiff's] standardized test results also show some higher scores, consistent with less than marked limitation in this area.  For example, the undersigned considers that though the record notes some similarly lower scores on Standardized Testing and Reporting (STAR), his scores in *201[1]* were in the advanced range for English-language arts; in *2012* were in the proficient range for English-Language Arts and in the basic range for mathematics; and in *2013* were in the basic range for science.  [AR at 658, 683, 695, 778.]  Additionally, as previously discussed, [plaintiff's] valid scores on WISC-IV testing in November *2009* showed low-average to average intellectual functioning.

[Id. at 1116, 1120 (some citations omitted) (emphases added).]

With respect to these issues, Dr. Grossman testified that he based his opinion that plaintiff's

14

limitations were "less than marked" in acquiring and using information at least in part on plaintiff's "variable performance, academically." [Id. at 1140.] However, even a cursory review of plaintiff's school records, transcripts, and grades reflects that any of his higher grades (such as an A in English and B in math on his 10th grade school transcript for the semester ending January 2018 [see, e.g., id. at 1306]), were received in his special education classes in which -- since 2008 -- he has received "modified grades on the standards-based report card" and for which "Differential Grading Standards" were being utilized in both General Education and Special Education classes. [See, e.g., id. at 255.] Indeed, that 10th grade transcript also reflects that in that same semester, in his general education classes, plaintiff received an F in Weights & Conditioning, an F in Art I, a D in Biology, and a D- in World History -- classes for which plaintiff was *not* in a special education class.  [Id. at 1306.]

Additionally, the record reflects that the academic work plaintiff was doing in his special education English and math classes was not just a "bit behind academically" as woefully understated by Dr. Grossman, but *well* below grade level in every case where such information is available in the record.  For instance, the form reflecting plaintiff's "Present Levels of Academic Achievement and Functional Performance," completed for his IEP in the fall of plaintiff's 10th grade year, reflects the following:

> Reading Comprehension -- [S.W.] is able to answer comprehension questions at the *5th/6th grade level*.  He struggles with understanding informational text at grade level.  Written expression -- [S.W.] is able to write a paragraph when given a topic. He struggles with producing writing that is clear and organized.  Math -- [S.W.] knows most of his *multiplication facts*.  He struggles with understanding word problems.

[Id. at 1310 (emphases added).]  Other such examples are discussed below.  Dr. Grossman's characterization of plaintiff's academic achievement status as only being a "bit behind academically," therefore, was neither specific nor clear; nor did it take into account the substantial evidence of record to the contrary.

Furthermore, in stark contrast to Dr. Grossman's characterization of plaintiff's STAR scores as reflecting (without citation) that plaintiff is "Proficient" in English and Language Arts ("ELA") and

"Basic" in math,[8] the Spring 2015 score report of plaintiff's results on California's assessment tests reflects that plaintiff "did not at that time meet the achievement standard"[9] in ELA or in mathematics, and suggested that he "needs *substantial* improvement to demonstrate the knowledge and skills" in those two areas that is "needed for success in future coursework." [Id. at 1416-17 (emphasis added).]  Plaintiff's performance on six of the seven sub-test results -- Reading, Writing, Listening, Research/Inquiry, Problem Solving & Modeling/Data Analysis, and Concepts & Procedures -- was deemed to be "Below Standard." [Id. at 1417.]  Only with respect to Communicating Reasoning, i.e., demonstrating the ability to support mathematical conclusions, was plaintiff's performance deemed to be "At or Near Standard." [Id.]

In fact, the ME's opinion that on his STAR testing plaintiff received "an advanced grade in English and language art, and proficient in English and language art, basic in math," and the ALJ's similar determinations that plaintiff's STAR score (1) in 2011[10] was in the advanced range for ELA; (2) in 2012 was in the proficient range for ELA and in the basic range for mathematics; and (3) in 2013 was in the basic range for science, are not actually supported by a careful and thorough review of those records.  For instance, plaintiff's 2011 "Advanced" score in ELA was a "modified" score and he took the test with accommodations; his reading level was determined to be at the 2nd-grade level -- plaintiff was then in the 3rd grade; and the score was alternatively described as "FBB" (Far Below Basic).  [Id. at 683, 684; see also id. at 660, 695.]  In 2012, plaintiff's "Proficient" ELA score was also a "modified" score and he took the test with accommodations; and his reading grade level on that test was noted to be at grade 1.5 -- plaintiff was then in the 4th

---

[8]    As discussed below, plaintiff's STAR scores of "proficient" in ELA and "basic" in math, were achieved in 2012.  [AR at 695.]

[9]    The test-taker's overall score in each domain is broken down into four possible categories: standard exceeded, standard met, standard nearly met, and standard not met -- the category into which plaintiff's scores fell.

[10]    The ALJ mistakenly stated that plaintiff's "advanced" STAR score in ELA was received in 2010.  [See AR at 1120.]  His "advanced" score was actually received in 2011 testing [id. at 683, 695]; in 2010, when plaintiff took the STAR tests without any accommodation, his scores in ELA and in mathematics were noted to be "FBB" -- Far Below Basic.  [Id. at 695.]

grade.  [Id. at 658, 659, 695.]  And, plaintiff's 2012 "Basic" score in Mathematics was also a "modified" score and he took the test with accommodations; he did not meet the target score for all students; and his score was also alternatively described as "BB" (Below Basic).  [Id. at 658, 659. 660.]

Not mentioned by either the ME or the ALJ, in 2010 when plaintiff was then in 2nd grade, he took the STAR tests without accommodation, and his ELA and math scores were both deemed to be "Far Below Basic."  [Id. at 695.]  What all of plaintiff's scores generally reveal, therefore, is that without providing and/or accounting for testing accommodations and/or modified scoring, plaintiff's achievement on these tests is well below grade level.

The ALJ also stated that although plaintiff was "noted to have trouble focusing, causing difficulty in the area of comprehension and grasp of major math concepts, . . . the record notes that [he] was nevertheless capable of obtaining passing grades in most classes and was even able to earn above-average and excellent grades in mathematics, science, and English at times."  [Id. at 1122 (citing id. at 1305, 1329, 1344-45, 1364).]

Again, there is no evidence provided by the ALJ (or defendant) that actually *supports* Dr. Grossman's or the ALJ's opinions that plaintiff's grades in any of his academic classes could be considered to be "advanced" or were received for work done in a regular classroom setting; that plaintiff did *not* have a "serious academic issue" in both his regular and special education classes; that plaintiff has done "some very admirable things academically" (as reflected by his scoring an "advanced" grade in ELA and a "basic" grade in math on his STAR testing, as well as "above-average" or "excellent" grades at times); that plaintiff's "basic" grade in math means that "he does math okay"; or that plaintiff was only a "bit behind academically."  Indeed, as noted by plaintiff at the hearing, Dr. Grossman's testimony simply is "not substantiated by anything [i]n the record."

In short, the records reflecting plaintiff's so-called "advanced," "proficient," and "basic" scores on California's STAR testing, and his allegedly above average and excellent grades "at times," simply do not provide support for the ALJ's determination that those marks are "consistent with less than marked limitation" in the functional area of acquiring and using information, and

1  attending and completing tasks, in light of the record as a whole.

2

3                  **b.**    **Other Standardized Testing**

4          The ALJ also relied on other standardized testing to find that plaintiff's functional limitation

5  in acquiring and using knowledge was "less than marked":

6          The undersigned acknowledges that [plaintiff's] school records note that he at times
   earned marks in the below-average or failing range, and he has some low scores
7          on standardized testing.   For example, he scored in the 3rd to 10th sample
   percentile on the PSAT in fall of *2016*.   In September *2016*, he scored in the below-
8          basic range on the California Assessment of Student Performance and Progress
   (CAASPP) test.   Earlier, in October *2014*, on Woodcock-Johnson III Normative
9          Update Tests of Achievement, Form A, [plaintiff] achieved a Total Achievement
   national percentile rank of 3, with low scores in broad reading and broad written
10         language, and very low scores in broad mathematics, math calculation skills, and
   brief mathematics when compared to age peers.   When compared to others at his
11         age level, however, his standard scores were low-average in brief reading, written
   expression, and brief writing.

12

13 [AR at 1446.]

14         As noted by the ALJ, plaintiff took the PSAT in 9th grade in the fall of 2016.   [Id. at 1333-

15 36.]   On that standardized test, plaintiff scored in the third percentile in reading and writing, the

16 tenth percentile in math, and in the fourth percentile overall.   [Id. at 1334.]   In 2014, when plaintiff

17 was in the 7th grade, he was administered the Woodcock-Johnson III Normative Update Tests of

18 Achievement.   [Id. at 1448-50.]   The results of that evaluation demonstrated that plaintiff's overall

19 score on the series of achievement tests taken was in "the lowest 3 percent of twelve-year-old

20 children nationally" [id. at 1448], and that his grade level equivalent for each of the 24 functional

21 test areas was generally in the third grade range (with the exception of brief writing (4.4), written

22 expression (4.3), story recall (5.0), and writing samples (6.9)).   [Id. at 1449.]   These results are

23 consistent with plaintiff's earlier standardized test results as detailed in the Court's 2014 Opinion,

24 and again in its 2016 Opinion:

25         [B]etween 2009 and 2011 "plaintiff was administered various standardized tests,
   including the California Achievement Test ('CAT'), four administrations of 'District
26         Wide Assessments,' and the 'California Standards Test.'"   [AR at 538 (citing AR at
   146, 239.]   Plaintiff's 2009 CAT scores in "Math" and "Reading" each yielded a
27         "National Percentile Rank" of 2, while his scores in "Science" and "Spelling" each
   yielded a "National Curve Equivalent" score of 0.   [Id.]   Based on his 2010 California

28

1    Standards Test scores in "English-Language Arts" and "Math," plaintiff was assigned
2    a proficiency level of "FBB [Far Below Basic]."   [Id. (see also id. at 695).]

3    [Id. at 1188-89.]

4    Here, after detailing a number of standardized test scores from 2014 through 2016
5    reflecting very low performance on those tests, and grades reflecting "below-average or failing
6    range," the ALJ determined that plaintiff's "standardized test results [from 2009 to 2013] also show
7    some higher scores, consistent with less than marked limitation" in the area of acquiring and using
8    information.  This suggests to the Court that the ALJ implicitly recognized that plaintiff's more
9    recent 2014 through 2016 scores reflect at least a marked limitation -- an assessment that the
10   Court finds is supported by substantial evidence *including*, but not limited to, plaintiff's earlier
11   standardized scores from 2009-2013.

12   Furthermore, the ALJ's finding that plaintiff's 2014 Woodcock-Johnson scores reflected him
13   being "low-average in brief reading, written expression, and brief writing" when compared to others
14   at his age level, appears to be based on the "Summary of Standard Scores" included with that
15   report as prepared by the Education Specialist who administered plaintiff's test, and which itself
16   does not accurately reflect the actual test scores accompanying the report.  [See id. at 1450.] The
17   actual Woodcock-Johnson test scores, in fact, clearly reflect that plaintiff is "Limited" or "Very
18   Limited" in *all* assessed academic areas (except Writing Samples where his performance was
19   "Average"); that his overall performance placed him "in the lowest 3 percent of twelve-year-old
20   children nationally"; and that his grade-level equivalent for most of the scores reflected that he was
21   performing at a third-grade level -- *well below* his actual seventh-grade placement.  [Compare id.
22   at 1450 with id. at 1448, 1449.]  The evaluator also noted that his scores were "very low
23   (compared to age peers) in broad mathematics, math calculation skills, and brief mathematics."
24   [Id. at 1450.]

25   These records simply do not provide support for the ALJ's determination that plaintiff's
26   standardized test scores are consistent with less than marked limitation in the functional area of
27   acquiring and using information (or any other functional area), in light of the record as a whole.

28

### c.    IQ Testing

As acknowledged by defendant, when standardized tests are available, they are the preferred method of documentation to be used as the measure for a claimant's functional parameters.  A valid score on the test that is at least two standard deviations below the norm, but less than three, will be considered a marked restriction.  20 C.F.R. pt. 404, subpt. P, app. 1, § 112.00C; [see also AR at 1110.]  Scores that are three or more standard deviations below the mean are considered an "extreme" restriction.  [AR at 1111.]

In this case, plaintiff's Full Scale IQ score of 83 as determined by consulting examiner Kim Goldman, Psy.D., on November 12, 2009 [AR at 337-41], is less than two standard deviations below the mean for the test.  See 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.00H(2)(a) (noting that individually administered standardized tests of general intelligence must meet program requirements and have a mean of 100 and a standard deviation of 15).  A marked limitation on acquiring and using information and/or on attending and completing tasks, therefore, would be found if plaintiff's functioning in those areas is "what would be expected" of someone who scored at least two, but less than three, standard deviations below the mean (regardless of the actual score) on the IQ test.[11]

---

[11]   The Administration generally considers an IQ score of 40 or above obtained at age 7 or older to be current for two years and that "IQ's [sic] obtained from tests having the desirable qualities [of reliability and validity] described above tend to stabilize by the age of 16."  Social Security Administrations Program Operations Manual ("POMS") DI 24515.055.  See Knott v. Barnhart, 269 F. Supp. 2d 1228, 1234 (E.D. Cal. 2003) (noting that the POMS "is an internal Social Security Administration manual, for the internal use of Social Security Administration employees, and has no legal force and does not bind" the Administration).  It can, however, be persuasive authority in discerning the Administration's interpretation.  See Hermes v. Sec'y of Health & Human Servs., 926 F.2d 789 n.1 (9th Cir. 1991) (citation omitted).

Thus, pursuant to that authority, the 2009 test, administered when plaintiff was not quite 8 years old, was given far beyond the time for which to consider it a valid indicator of IQ in 2016 -- almost eight years later. To rely on an outdated, childhood IQ score to determine intellectual disability is legal error.  See Garcia v. Comm'r of Soc. Sec., 768 F.3d 925, 931 (9th Cir. 2014) ("It is essential for complete -- rather than partial -- sets of IQ scores to be used in evaluating intellectual disability.").  Thus, for the ME and the ALJ to rely on a vastly outdated IQ test as the primary rationale for determining that plaintiff's IQ must be higher than the more recent full scale
(continued...)

Plaintiff's Full Scale IQ score of 52 in 2016, however, is more than three standard deviations below the mean, which, on its own, qualifies as an "extreme" restriction in the functional area of acquiring and using information and/or in attending and completing tasks. Even considering the WISC-IV subtests separately, Verbal Comprehension (65), Working Memory (68), and Processing Speed (59) all qualify as "marked" restrictions [id. at 1302], and plaintiff's score in Perceptual Reasoning (51) by itself constitutes an "extreme" restriction. Dr. Campbell's mental status examination reflected that plaintiff was restless, had noticeable difficulty sitting still, showed some impulsive and socially inappropriate behaviors such as reaching into his pants to adjust his underwear, he was alert but not oriented, his attention and concentration were impaired, he presented with obvious cognitive delays, his receptive and expressive language was intact, his thought content was unremarkable, his associations were logical and goal-directed, and his judgment and insight were reasonable. [Id. at 1301.] Dr. Campbell noted that the test results "appear to be a reasonably accurate representation of [plaintiff's] current cognitive and psychological functioning," and he "appeared to give tasks a good effort." [Id. at 1302.] Although Wanda W. and plaintiff both described plaintiff's disability and relevant background information (such as developmental, family, educational, and medical background), she did not have any legal, educational, medical, or psychological records available for review. [Id. at 1300.] While, as noted by Dr. Campbell, plaintiff's Full Scale IQ score of 52 fell into the extremely low range of intellectual functioning, she stated that there was insufficient evidence before her to "render a diagnosis of mental retardation (intellectual disability)" as she had no measure of adaptive behavior and no information regarding plaintiff's school functioning, both of which "would be necessary in order to give such a diagnosis." [Id. at 1302.] She further noted that he has "significantly impaired cognitive functioning," is impulsive, and has deficits in attention, "which are likely to be due to both ADHD and impaired cognitive functioning." [Id. at 1302-03.] She found plaintiff to be markedly impaired in his ability to sustain activity for a period of time, and his ability to engage in school and

---

[11](...continued)
IQ score of 52 obtained in 2016, was legal error.  Additionally, the ALJ did not himself specifically find that the 2016 IQ test scores were invalid -- and there is no apparent reason to do so.

play activities in an age-appropriate manner; she found him moderately impaired in his ability to communicate by understanding, initiating, and using language, relate to peers in an age-appropriate manner, relate to adults in an age appropriate manner, maintain appropriate conduct in the community, and perform activities of self care at an age-appropriate level.  [Id.]

There is simply no support in the record for Dr. Grossman's suggestion -- which the ALJ relied on and which the Court discussed and rejected above -- that Dr. Campbell's 2016 psychological evaluation (when plaintiff was 15 years old) was less valid than the evaluation conducted using the same IQ test in 2009 (when plaintiff was not quite 8 years old).  This is especially true in light of the fact that the information relied on by Dr. Grossman in arriving at his conclusion (that plaintiff was receiving advanced grades, does math "okay," is generally in a regular classroom setting, and plays baseball and football, among other things), was itself misconstrued, misinterpreted, and/or simply inaccurate.

Even without considering that a Full Scale IQ score of 52 is by itself an extreme limitation, this 2016 testing provides substantial support for finding at least marked limitations in acquiring and using information, attending and completing tasks, and interacting with and relating to others. Such a result is further cemented when considered along with Wanda W.'s testimony, plaintiff's academic records, and school records reflecting ongoing inappropriate and disruptive behaviors in the classroom and elsewhere, often serious enough to result in suspension from school.

### d.    Relating to Others and Self Care

As noted by plaintiff, Wanda W. stated in her April 14, 2010, function report that plaintiff was "aggressive, with anger issues, difficulty focusing and poor impulse control which had gotten worse." [JS at 12.]  An October 29, 2008, Psychoeducational Assessment Report[12] showed that plaintiff was engaging in a number of behaviors in the classroom "that may be adversely affecting other children," is restless and impulsive, and has difficulty maintaining his self control.  [AR at

---

[12]    It appears that this assessment may have been the initial report prepared by the School Psychologist.  Only every other page of the Report is included in the record.  [See AR at 151-56; see also id. at 265-70.]

155.] He also sometimes displayed aggressive behaviors "such as being argumentative, defiant, and/or threatening to others," and he "frequently engages in rule-breaking behavior, such as cheating, deception, and/or stealing." [Id.] His scores on the Behavior Assessment reflected that he fell into the "At-Risk" classification on measures of hyperactivity, aggression, adaptive skills, study skills, social skills, and functional communication. [Id. at 153-56.]

Plaintiff notes that other elementary school records reflect the following:  nine separate incidents of defiance, disrespect, disruption, profanity, and cause of injury in 2008 [id. at 144]; two incidents of causing physical injury to others in 2010 [id. at 144]; 21 unexcused tardys in the third grade, which included incidents of leaving the classroom without permission [id. at 143, 144]; 62 incidents of school office visits between September 2008 and January 2011 for injury, headaches, stomach aches, nausea and vomiting, asthma, fatigue, and to change clothes.  [Id. at 143-45.] In August 2008, a teacher's disciplinary write up describes plaintiff's aggressive and disruptive behavior (hitting another child), lack of discipline, hiding under the table, leaving his desk, hiding in the restroom, leaving the classroom, and disobedience. [Id. at 159-60.]

The record further reflects that in February 2015, plaintiff's family requested Kaiser Permanente to provide him with anger management classes [id. at 1481]; an October 14, 2015, psychoeducational report reflected that between 2012 and 2014 plaintiff's behavior in school included being easily distracted, a habit of avoiding telling the truth, he was unfocused, he "[n]eeds to listen to follow directions," and he shows "[v]ery little effort."  [Id. at 1408.]  That report also noted that on observation in the classroom, plaintiff "had great difficulty getting and remaining on task," and he "use[d] his phone frequently, when his teacher wasn't looking at him."  [Id.]  In November 2015, it was reported that plaintiff "seeks negative attention from his peers and does not know how to positively accomplish this task"; he "desires to have an audience so he uses profanity, makes inappropriate comments and speaks without permission"; and he "acts out to avoid having to do the work." [Id. at 1393.]

Later records reflect that plaintiff's inappropriate behavioral issues continued and had become more serious, resulting in suspension from school.  For instance, on December 9, 2015,

he was suspended for one day for bringing a vape pipe to school and providing it to three other students [id. at 1379]; on December 1, 2016, he was suspended for one day after he pulled down his pants in class [id. at 1363]; on December 6, 2016, he was suspended for two days for putting his hands down another student's pants -- plaintiff's "2nd incident involving a sexual offense within 1 week" [id. at 1362]; on December 13, 2016, it was noted that his behavior included sending text messages of a sexual nature to girls, acting out in a sexual manner, and using profanity, and it was further noted that if he is spoken to in a "harsh manner it might cause his behaviors to intensify" [id. at 1360]; on May 25, 2017, plaintiff was suspended for two days after being involved in an incident involving fireworks [AR at 1331]; and an October 2017 record reflects that ten times or more a week, plaintiff's negative attention seeking behaviors include using profanity, making inappropriate comments, speaking without permission, and acting out in a very sexual nature.  [Id. at 1321.]

Wanda W. testified at the hearing as follows:  plaintiff will do his homework if she sits down with him, "side-by-side"; he will tell her he has no homework and she will search his bag and find that is not true; he does not like to sit in his classes that are too hard for him where "he don't want to seem like that he don't know it when his other classmates might be doing it"; he does not participate in clubs or sports; he hangs out with friends at home and at school but gets into conflicts with them; his friends take advantage of him; sometimes when he has a friend at the house, plaintiff just leaves the house with the friend still there; plaintiff, who is 17, hangs out with younger kids who are around age 13 -- and hanging out with younger children has always been his pattern; the school psychologist told her that plaintiff needs a smaller class setting, which cannot be provided, but that ever since elementary school he has had teachers who would "make him sit beside them so they can help keep him focused on what is going on"; the school psychologist also told her that she is going to try to get a teacher's aide who will be with plaintiff one-on-one to help keep him focused and to help when plaintiff "gets agitated and . . . leaves the classroom, you know, and do outbursts and stuff"; he continues to have angry outbursts at her and sometimes "get[s] to slamming and throwing things"; and that he always needs to be reminded

about his appointments or deadlines (including getting to school on time).  [Id. at 1153-64.]

Adequate functioning in the domain of interacting and relating to others for an adolescent includes that the child should be able to initiate and develop friendships with children of the same age.  [Id. at 1123.]  Limited functioning is evidence by, among other things, having close friends who are all older or younger than the child, or having difficulty playing games or sports with rules. In the domain of self care, a younger child should be able to understand what is right and wrong and what is acceptable and unacceptable behavior; begin to demonstrate consistent control over his behavior; and avoid behaviors that are unsafe or otherwise not good for him.  An adolescent in this domain should begin to discover appropriate ways to express his good and bad feelings and take his medications as prescribed.  [Id. at 1125.]  As previously discussed, a "marked" limitation is one that "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities," and an "extreme" limitation is one that "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities."

Crediting Wanda W.'s testimony as true, and considering it along with the other records discussed above, supports a finding that plaintiff's behavior at the very least seriously affects his ability to acquire and use information, attend to and complete tasks, interact and relate with others, and care for himself as defined by the Regulations.  A contrary finding is not supported by the record.

## 2.    Specific Learning Disability

With respect to plaintiff's specific learning disability, the ALJ found that it was not a severe impairment because "there is little objective evidence of more than minimal functional limitations lasting 12 months or longer arising from th[is] impairment[]."  [Id. at 1111.]  While he acknowledged that plaintiff's academic records "mention a specific learning disability in the areas of visual processing and attention that made it difficult for [plaintiff] to participate successfully in the general education setting without specialized academic support," the ALJ also noted the following:

> [Plaintiff] was able to achieve passing grades in the majority of his classes, despite his difficulties.  Various school psychologist evaluations reportedly noted low-

1   average to average cognitive ability, despite discrepant reading decoding/
2   comprehension and math calculation/reasoning, due to auditory and visual
    processing deficits, and weak attention; however, these evaluations are mentioned
    by history and in summary.  Notably, on valid objective Wechsler Intelligence Scale
3   for Children - IV (WISC-IV) testing in November 2009, [plaintiff] scored in the low-
    average to average range, and no specific learning disorder was diagnosed at that
4   time.  Although later testing in December 2016 resulted in extremely low scores on
    the WISC-IV, including a full-scale IQ of 52, consultative examiner Dr. Campbell also
5   noted that there was "insufficient evidence at this time to render a diagnosis of
    mental retardation (intellectual disability)," as Dr. Campbell did not have a measure
6   of adaptive behavior or information regarding [plaintiff's] school functioning.  Given
    [plaintiff's] earlier, higher test scores on the WISC-IV, Dr. Campbell's statements,
7   and school records reflecting [plaintiff's] capacity for passing grades, as further
    discussed below, the undersigned finds insufficient evidence of significant functional
8   limitations arising from a specific learning disability, finding that [plaintiff's] mental
    limitations primarily arise from his ADHD and impulse control disorder, as further
9   discussed below.

10  [Id. at 1112 (citations omitted).]

11         A student has a specific learning disability under the Individuals with Disabilities Education

12  Act ("IDEA") if he or she has "a disorder in [one] or more of the basic psychological processes

13  involved in understanding or in using language, spoken or written, which disorder may manifest

14  itself in the imperfect ability to listen, think, speak, read, write, spell, or do mathematical

15  calculations."  20 U.S.C. § 1401(30)(A).  Here, plaintiff's entire academic record since 2008,

16  including his Individualized Education Program ("IEP") documents, his transcripts, and the results

17  of standardized testing, consistently reflects the school psychologist's 2008 findings that plaintiff

18  has a specific learning disability as defined by § 1401(30)(A).  [See, e.g., AR at 167, 191, 1338,

19  1383, 1409, 1413, and others.]  In fact (and contrary to the ALJ's statement that the school

20  psychologist evaluations are mentioned only "by history and in summary"), in what appears to be

21  plaintiff's original evaluation by the school psychologist in the fall of 2008, the school psychologist

22  found there was a severe discrepancy between plaintiff's intellectual ability and his achievement

23  in math calculation, math reasoning, basic reading skills, reading comprehension, and written

24  expression.  [Id. at 156.]  That evaluation, which was based on various psychoeducational and

25  behavioral test results, and teacher evaluations, recommended that plaintiff receive "[p]referential

26  seating in front of class away from doors and windows," that he be allowed extra time for a verbal

27  response and  be "cue[d]" before being called upon, and that he be provided visual and kinesthetic

28

inputs and instructions, as well as structured opportunities to explore issues related to social/personal development.  [Id. at 156; see also id. at 151-56.]  These recommendations are generally reflected in all of plaintiff's IEPs going forward into high school.

As part of plaintiff's October 29, 2008, IEP, it was determined that in the areas of reading and language arts and mathematics, "[a]ll accommodations listed on the state/district-wide testing will apply to testing in the classroom"; all directions would be simplified and clarified; all tests would be modified; plaintiff would be allowed extra time to complete all tests; standardized tests would be administered in a small group setting; his class assignments and homework would be modified; he would be given extra time to complete tasks; he would receive modified grades in the areas in which he was receiving special education support; and there would be "collaboration" between the general education teacher and the education specialist on his final grades in his general education classes.  [Id. at 180, 255; see also id. at 181-82, 255.]  In 2010, it was specifically made clear that even in his general education classrooms, plaintiff "will receive accommodations . . . such as extended time on homework, classwork, and tests, clarified instructions, modified or shortened assignments, peer tutoring, and any other accommodations the General Education Teacher feels are appropriate, and that his grades were to be determined pursuant to "Differential Grading Standards" in both General Education and Special Education classes.  [Id. at 255.]  These modifications and accommodations are reflected in all of his IEPs and other academic records into high school.  Thus, there is ample evidence that plaintiff's specific learning disability resulted in "more than minimal functional limitations" in school functioning (and in the areas of acquiring and using information, and in attention and concentration), and that this impairment not only lasted more than twelve months, it has significantly affected plaintiff's academic functioning for more than eight years.

Also not supported by the record is the ALJ's determination that plaintiff's noncompliance with medication leads to his disruptive behavior.  [Id. at 1123.]  While the academic records do reflect that without his medication, plaintiff has "difficulty staying focused and on task" [see, e.g., id. at 1321], it also reflects that he engages in acting out behavior "to avoid having to do the work,"

and that he "seeks attention from his peers and when the work is too difficult for him in math or any other subject, he does not comply with the classroom rules." [Id. at 1322; see also discussion, part V.D(1)(d) supra ("Relating to Others and Self Care").]   There is no evidence that these disruptive classroom behaviors, or even the more severe behaviors that later resulted in his numerous suspensions from high school, are related to his medication compliance or noncompliance.

The ALJ also relied on the fact that on the November 2009 WISC-IV testing, the evaluator did not diagnose a specific learning disability.   As discussed previously, however, a specific learning disability is "a disorder in [one] or more of the basic *psychological* processes involved in understanding or in using language, spoken or written, which disorder may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations."   20 U.S.C. § 1401(30)(A) (emphasis added).   An IQ score, therefore, is not itself an indicator of a specific learning disability without other records reflecting academic performance.   As the evaluator had no records relating to plaintiff's school functioning, it is not surprising that she did not herself diagnosis a learning disability (which, nevertheless, had been diagnosed by the school psychologist a year earlier).

Accordingly, the Court finds that the ALJ did not provide legally sufficient reasoning supported by substantial evidence for his determination that plaintiff's specific learning disability is nonsevere (which he based in part on the "higher" 2009 IQ scores, Dr. Campbell's inability to confirm that the low IQ score achieved in 2016 reflected mental retardation, and in part on the fact that plaintiff's school records reflect plaintiff's capacity to obtain passing grades in his classes (a misinterpretation of plaintiff's grades and actual academic progress as previously discussed above)).   Indeed, the substantial evidence of record supports the presence of a specific learning disability.

# VI.

## REMAND FOR PAYMENT OF BENEFITS

The Court has discretion to remand or reverse and award benefits. Trevizo v. Berryhill, 871 F.3d 664, 681 (9th Cir. 2017) (citation omitted). Where (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand, it is appropriate to exercise this discretion to direct an immediate award of benefits. Garrison, 759 F.3d at 1020 (setting forth the three-part credit-as-true standard for exercising the Court's discretion to remand with instructions to calculate and award benefits); see also Lingenfelter, 504 F.3d at 1041; Benecke v. Barnhart, 379 F.3d 587, 595-96 (9th Cir. 2004). Where there are outstanding issues that must be resolved before a determination can be made, and it is not clear from the record that the ALJ would be required to find plaintiff disabled if all the evidence were properly evaluated, remand is appropriate. See Benecke, 379 F.3d at 593-96; see also Connett v. Barnhart, 340 F.3d 871 (9th Cir. 2003) (cautioning that the credit-as-true rule may not be dispositive of the remand question in all cases, even where all three conditions are met). In Garrison, the Ninth Circuit, noting that it had never exercised the flexibility set forth in Connett in a published decision, clarified that the nature of that flexibility is "properly understood as requiring courts to remand for further proceedings when, even though all conditions of the credit-as-true rule are satisfied, an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled." Garrison, 759 F.3d at 1020-21; see also Brown-Hunter v. Colvin, 806 F.3d 487, 495 (9th Cir. 2015).

In this case, even after being given a *third* chance to properly consider the issues raised by plaintiff in this Court and a second chance to comply with this Court's remand Orders, the Commissioner has nevertheless again failed to provide legally sufficient reasons for failing to properly consider the record as a whole. Specifically, under Connett, the Court finds that remand for payment of benefits is appropriate because, as discussed above, the ALJ failed to provide

legally sufficient reasons supported by substantial evidence for the following:  (1) finding plaintiff's specific learning disability to be nonsevere; (2) giving great weight to Dr. Grossman's opinions, which were not supported by the record[13]; (3) discounting Dr. Campbell's 2016 valid testing results in favor of the results obtained on the same test in 2009 when plaintiff was seven-years old; (4) finding that plaintiff had "achieved at least average grades in many classes," including earning As and Bs in grades nine and 10 [AR at 1120-21], which was based on misstating and/or misinterpreting plaintiff's academic record and the modified scores he received on various standardized and other tests; (5) not properly considering plaintiff's behavioral issues and the effect of his behavior on his academic performance as well as with respect to relating to others and/or self care; and (6) not fully crediting as true the testimony of Wanda W., for instance, with respect to plaintiff's impulsive behavior, inability to concentrate, and friendships with much younger children rather than same-age friends.  When the record is evaluated accurately and as a whole, there is not a serious doubt that plaintiff is, in fact, disabled.  In fact, Dr. Campbell's valid test results by themselves reflect an extreme limitation in the area of acquiring and using information. Even if those results were interpreted to reflect only a "marked" restriction, there is ample evidence in plaintiff's academic and medical record that support finding a marked restriction in at least two of the functional domains, i.e., acquiring and using information, attending and completing tasks, and/or interacting and relating with others.  Had the ALJ properly credited Dr. Campbell's opinion, properly interpreted plaintiff's academic and testing records, and properly credited the testimony of Wanda W., plaintiff's disability would have been conclusively presumed and benefits awarded. Lounsbury, 468 F.3d at 1114.

Thus, the Court sees no purpose in returning the case to the Commissioner to make a fourth determination, based on the same evidence previously considered, specifically plaintiff's

---

[13]   The Court notes that the ME at the December 3, 2014, remand hearing also never specifically addressed plaintiff's specific learning disability, and this Court deemed his testimony to be confusing and ambiguous.  [AR at 1190, 1191 & n.6.]  Here, the Court determines that Dr. Grossman's testimony was not just confusing -- it was inaccurate, and/or misconstrued and/or misinterpreted plaintiff's academic and other records as discussed herein and, therefore, did not constitute substantial evidence upon which the ALJ could rely.

standardized testing, IQ scores, specific learning disability, behavioral issues, and academic record.  "Allowing the Commissioner to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication."  Benecke, 379 F.3d at 595.  While not a reason to remand for an award of benefits, plaintiff has already waited almost eleven years for a disability determination.  See id.  Under all of these circumstances, the Court is persuaded that "remanding for further administrative proceedings would serve no useful purpose and would unnecessarily extend [plaintiff's] long wait for benefits."  Id.

## VII.

## CONCLUSION

**IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for payment of benefits.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED:  May 7, 2020

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE